**AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS et al., Plaintiffs,**

v.

**Alfred E. KAHN, Chairman of the Council on Wage and Price Stability, et al., Defendants.**

Civ. No. 79–802.

United States District Court, District of Columbia.

May 31, 1979.

Laurence Gold, J. Albert Woll, Washington, D. C., for plaintiffs, American Federation of Labor and Congress of Industrial Organizations, et al.

Laurence H. Silberman, Washington, D. C., for and on behalf of the amici curiae, Certain United States Senators and Representatives.

Barbara Allen Babcock, Asst. Atty. Gen., Civil Division, and Dennis G. Linder, Maryann Clifford, Keith M. Werhan, Dept. of Justice, Washington, D. C., Sally Y. Katzen, Council on Wage and Price Stability, Washington, D. C., for defendants, Alfred E. Kahn, et al.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

The issue presented for determination in this proceeding is whether President Jimmy Carter acted with statutory authority and within permissible constitutional limits when he issued Executive Order 12092, 43 Fed.Reg. 51375 (1978).[1] The Order and implementing regulations provide for debarment of federal contractors who do not comply with the administration's wage-price guidelines. The announced purposes of the Order are to curb escalating inflation, to provide standards to stem the continuing rise of wages and prices in the private economy, and to reduce inflationary cost trends in government procurement processes.

The American Federation of Labor and Congress of Industrial Organizations, and nine of its affiliate international unions, including the United Rubber, Cork, Linoleum and Plastic Workers of America (United Rubber Workers or URW), challenge the Order and its implementing regulations. They seek declaratory and equitable relief against the defendants Alfred E. Kahn and Barry P. Bosworth, the chief administrative officers of the Council on Wage and Price Stability (Council or COWPS), and Lester A. Fettig, Administrator of the Office of Federal Procurement Policy (OFPP), Office of Management and Budget. These officials administer and enforce the wage-price controls which are central to the President's actions.

The plaintiff unions charge that President Carter acted without statutory or constitutional authority and that the debarment mechanism constitutes in fact an unauthorized system of mandatory controls. They further charge that the President's action ignores and has the potential of destroying the long-standing and recognized public policy of free collective bargaining. They ask this Court to declare unlawful the system of wage controls embodied in the pay standard of the Order and the implementing COWPS and OFPP regulations. They also seek to enjoin the defendants from administering, enforcing or giving any effect to the system of controls as applied to wages.

The defendants respond that the program is not mandatory within the meaning of the Council on Wage and Price Stability Act (COWPSA)[2] and is implicitly authorized by the Federal Property and Administrative Services Act of 1949 (Procurement Act).[3]

The relevant matters and legal issues have been exhaustively briefed. The Court has reviewed the entire record and considered the oral presentations of the several able counsel.

█ For the reasons set forth below the Court decides that the President has acted without statutory authority and has invaded an area reserved for the Congress by Article I of the Constitution. The anti-inflationary program as embodied in the system of controls authorized by Executive Order 12092 is unlawful and must be rejected.

### Introduction

On November 1, 1978, following announcement of a general program to encourage voluntary wage and price restraint, President Carter issued Executive Order

---

1. Appendix A.

2. Pub.L. No. 93–387, 88 Stat. 750 (1974), 12 U.S.C. § 1904 note.

3. 40 U.S.C. § 486(a).

12092, entitled "Prohibition Against Inflationary Procurement Practices." In January and February, 1979, certain implementing regulations were promulgated by the Council on Wage and Price Stability and the Office of Federal Procurement Policy. The next month, immediately following the issuance of those regulations, the plaintiff unions filed the present complaint challenging the presidential action.

On May 2, 1979, the United Rubber Workers applied for temporary injunctive relief, seeking to enjoin the defendants from interfering with the then ongoing collective bargaining with several rubber companies and otherwise exercising authority under the Executive Order and the regulations. The application for a temporary restraining order was denied on May 4. At that time it appeared that cross motions for summary judgment were an appropriate and expedient means of presenting and resolving the issues involved. All counsel concurred, filed briefs on an expedited schedule and presented oral argument on May 16, 1979.

Certain United States Senators and Representatives were allowed to file a memorandum amicus curiae.[4] The memorandum addressed the issue of executive authority and their application for leave to file stated:

> The issues of statutory and constitutional authority for Executive Order 12092 presented in this case involve not only the interests of the parties to the action, but also the fundamental interest of Congress and its members in maintaining the constitutional authority entrusted to them.

## A. The Regulatory Scheme

In promulgating the Executive Order, President Carter invoked the authority found in "the Constitution and statutes of the United States of America, including . . . the Council on Wage and Price Stability Act . . . [and] the Federal Property and Administrative Services Act . . . ." The Order has a two-fold purpose: "to encourage noninflationary pay and price behavior by private industry and labor, and to provide for the procurement by Executive agencies and Military Departments of personal property and services at price and wage rates which are noninflationary . . . ."

The Order prescribes general standards to measure noninflationary wage and price behavior of private firms[5] and directs the Council on Wage and Price Stability to: issue guidelines to define further the standards for noninflationary pay and price behavior to be incorporated into government procurement contracts; monitor business compliance with them; publicize the names of noncompliant firms; publish procedures to be used in Council proceedings pertaining to the standards; and "take such other action as may be necessary and consistent with the purposes" of these directives.[6] The Order gives the Administrator of the Office of Federal Procurement Policy general responsibility for implementing the standards, including the issuance of regulations and procedures for determining exceptions and granting exemptions.[7] In addition, general sanctions are provided directing each executive agency and military department head to:

> ensure that their contracts incorporate, on or after January 1, 1979, a clause

---

4. The United States Senators and Representatives, all Republicans, include: Senator H. John Heinz, III, of Pennsylvania, Jake Garn of Utah, and John Tower of Texas; and United States Representatives Jack F. Kemp of New York, Clarence J. Brown of Ohio, Dave Stockman of Michigan, J. Danforth Quayle of Indiana, G. William Whitehurst of Virginia, Lyle Williams of Ohio, Tennyson Guyer of Ohio, Steven D. Symms of Idaho, Bill Frenzel of Minnesota, John H. Rousselot of California, Ron Paul of Texas, Robert S. Walker of Pennsylvania, Clair W. Burgener of California, Edward J. Derwin-

ski of Illinois, Norman D. Shumway of California, Don Young of Alaska, Gerald B. Solomon of New York, William Thomas of California, Newton Gingrich of Georgia, Lawrence Coughlin of Pennsylvania, and Jim Jeffries of Kansas.

5. The Order defines noninflationary pay behavior as "the holding of pay increases to not more than 7 percent annually above their recent historical levels." § 1–102(b).

6. Id., § 1–101.

7. Id., § 1–104.

which requires compliance by the contractor, and by his subcontractors and suppliers, with the [noninflationary pay and price] standards . . . of this Order.[8]

On December 28, 1978, the Council published final pay and price standards pursuant to § 1–101(b) of the Order. 43 Fed.Reg. 60772. The Council has published final procedural rules, which govern submission of reports and notifications requested by the Council as well as requests for approval of exceptions to the standards. 44 Fed.Reg. 1346 (1979).

On January 4, 1979, the Office of Federal Procurement Policy published a Policy Statement with the effect of final regulations. 44 Fed.Reg. 1229. Under the Statement, companies determined by the Council not to be in compliance with the noninflationary pay and price standards are ineligible for federal government contract awards anticipated to exceed $5 million, unless noncompliance is waived by the government. If after an award it is determined that a contractor was willfully not in compliance with the voluntary standards when he certified otherwise, the contract may be terminated or the contractor required to accept an equitable reduction of the contract price or cost allowance and profit or fee. The contractor must require a certification of compliance with the pay and price standards before awarding any first tier subcontract that exceeds $5 million.

The $5 million threshold directly covers approximately 50 percent of all government procurement dollars, but will actually influence up to 65 to 70 percent because many of the companies that must certify compliance for contracts exceeding $5 million also routinely bid on smaller government contracts.

The consequences of violating the certification provisions are serious. In addition to being declared ineligible for federal contracts, the names of noncompliant firms are circulated to all procuring agencies. Such

firms are ineligible for any further award until removed from the Council's list. OFPP rules make COWPS the sole determiner of whether a firm is in noncompliance. An accused company receives notice and an opportunity to file written comments before being placed on the list but COWPS decides whether a hearing will be held.

These regulations have allegedly had a direct and serious impact. The affidavit of Peter C. Bommarito,[9] International President of the United Rubber Workers, filed with the application for a temporary restraining order, shows that the URW was negotiating with the so-called Big Four rubber companies—Uniroyal, Firestone, Goodrich, and Goodyear—in an effort to renew their contracts. Specifically, the URW was bargaining with Uniroyal, the lead company, with the objective of achieving a settlement that would be a pattern setter for the industry. In seeking temporary injunctive relief, the URW alleged that during the week of April 16, 1979, it had reached virtual agreement with Uniroyal on a contract in excess of the President's wage guidelines and that Firestone and Goodrich had also tentatively agreed to the settlement. The affidavit states that the government then intervened, threatening Uniroyal with contract debarment, and ultimately forced that company to renege on the agreement. The company is said to have denied reaching an agreement, though not to have denied a governmental role in the negotiations. In any case, no agreement has been reached and the URW called a strike against Uniroyal which is at present in its third week.

### B. *The Government's Contentions*

In response to the union challenge, government counsel admit that this was the "first direct attempt . . . found [where the Executive used] the procurement power and . . . another executive agency to set wage and price guidelines

---

**8.** *Id.,* § 1–103.

**9.** For further evidence, see affidavits filed with Plaintiffs' Motion for Summary Judgment discussed at pages 101–102 *infra.*

through executive orders."[10] Nonetheless they stoutly maintain that President Carter's anti-inflationary program is based upon explicit statutory authority: that the Wage and Price Stability Act of 1974 authorizes the Council to establish the pay and price standards and that the regulatory scheme revolving around the debarment mechanism does not render the program involuntary; that the OFPP regulations designed "to ensure economy and efficiency in government procurement" are supported by the Procurement Act. They also insist that the anti-inflation measures pursued by Mr. Carter in no way conflict with prior congressional enactments.

■ The question of whether the President has exceeded permissible limits of statutory or constitutional authority is infrequently presented for judicial determination and is one which the Court approaches with great caution. The issue was before the Supreme Court in a strikingly similar situation in *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). The complexity of the issue is reflected by the number, length and variety of approaches of the several concurring opinions. For present purposes perhaps the most instructive is that of Mr. Justice Jackson who stated "[p]residential powers are not fixed but fluctuate, depending upon their disjunction or conjunction with those of Congress." 343 U.S. at 635, 72 S.Ct. at 870. He then delineated three situations where presidential powers might be challenged, and the legal consequences flowing from their "disjunction or conjunction with those of Congress:"

1. When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate. . . .

2. When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain. Therefore, congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility. . . .

3. When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject.

343 U.S. at 635–38, 72 S.Ct. at 870–871 (footnotes omitted).

Relying on Justice Jackson's first category the defendants contend that the wage-price guidelines and the debarment mechanism are authorized by COWPSA and the 1949 Procurement Act and that Mr. Carter's actions are therefore a lawful assertion of executive power, pursuant to an express or implied authorization of Congress.

In the next section the Court discusses these two statutes, considers the case authority upon which the government relies and concludes that they afford no foundation or support for the anti-inflationary program adopted by the President. Finally, the Court considers the debarment provisions of the Order and the government disclaimer that they are not mandatory.

### C. The Claimed Statutory Bases

Sections 2(c) and 3(a) of the Council on Wage and Price Stability Act and § 205(a) of the Federal Property and Administrative Services Act of 1949 are the announced bases for the program and authority for the debarment mechanism provisions.

**10.** Transcript of hearing on Cross Motions for Summary Judgment, May 16, 1979, at 30.

1. *The Council on Wage and Price Stability Act*

■ This is the less important of the statutes upon which the government relies. Section 2(c) of COWPSA provides for the appointment of a Director of the Council who performs such functions as the President or the Chairman of the Council shall prescribe. Section 3(a) in turn prescribes the Council's functions. In general they are to monitor and analyze wage and price developments; to encourage industry to practice price restraint; to work with labor and management in troublesome sectors of the economy in restraining prices; and to conduct public hearings generating an awareness of inflationary problems in all sectors of the economy. The Council's function in combating inflation is thus essentially hortatory. Nowhere is it authorized to impose sanctions.[11]

The defendants state that COWPSA provides authority for the "promulgation of voluntary, nonbinding pay and price standards and actions to publicize inflationary activities. . . ." Defendants' Motion for Summary Judgment at 14. But this is not in dispute. What is at issue is the debarment sanction which the government contends is authorized by the Procurement Act.

2. *The Federal Property and Administrative Services Act of 1949*

■ Absent any authority in COWPSA, the debarment sanction must find statutory justification in the authority granted the President under the 1949 Procurement Act. Section 205(a) empowers the President to issue "such policies and directives . . . necessary to effectuate the provi-

sions of [the] Act." Under § 201, Congress declared the purposes of the Act to be the promotion of "economy" and "efficiency" in procurement.

The Procurement Act was promulgated in response to recognized inadequacies in procurement and property management activities. The Congress was concerned with inefficiencies and other problems in these functions which had surfaced during and after World War II. They involved disputes among the various executive departments, including the military agencies. Earlier the Hoover Commission had found that various activities in this area were fragmented and recommended centralization of functions. The recommendation led to the creation of the General Services Administration which now concerns itself with the procurement, utilization and disposal of government property.

At a recent hearing before the House Committee on Government Operations concerning the administration's anti-inflation program and the reach of § 205(a), General Counsel Socolar of the General Accounting Office testified:[12]

Stated simply, the act contemplates a competitive procurement system with full and free competition consistent with the nature of the property or services being procured. Any restriction against competition must be consistent with the authorities for limiting competition specifically enumerated in the act.

\* \* \* \* \* \*

The legislative history of the 1949 Procurement Act shows that Congress specifically considered whether the procurement system should be used as a means

---

11. During the Senate debate on the measure, Senator Tower, the ranking minority member of the committee which reported out the bill, defined the Council's function:

Briefly, I would like to explain what the Council on Wage and Price Stability is and what it is not. The Council is first and foremost a forum—a forum which draws representatives from all sectors of the economy to debate freely and air economic issues. It is a

forum to collect economic information and follow the direction of the various economic sectors. It is therefore a forum with oversight authority and not an operating agency. 120 Cong.Rec. 28883 (1974).

12. *Adequacy of the Administration's Anti-Inflation Program (Part 1):* Hearings before a Subcomm. of the House Comm. on Government Operations, 96th Cong., 1st Sess. 4 (1979).

of regulating or controlling prices, and made clear its intent in the negative.

In a prepared statement lodged with the Committee he added: [13]

> In addition, there is no indication in the legislative history that any such use of the system was ever contemplated with respect to other sectors of the economy. Thus, to the extent that any guidance can be found in the language of the statute and the legislative history, not only do they offer no support for the view that the procurement functions of the GSA Administrator or executive agencies could include the use of the procurement system as a means of price regulation or control; they affirmatively indicate the contrary.

This Court is of course not bound by the views of the General Accounting Office or its chief counsel, but they may be instructive. The legislative history of the Procurement Act lends substantial support to his conclusions.

Despite this legislative history the defendants urge that there is a direct relationship between the wage and price program and the Procurement Act's objective of promoting economy and efficiency in government buying in that the program by curbing inflation ultimately will result in lower prices to the government. However, this argument ignores another possible result, namely, that the government, in the name of "economy," will be forced to pass over the low bidder in order to do business with an adherent to the wage guidelines. Such an indirect and uncertain means of achieving economy in government buying was certainly not contemplated nor would it appear that the Congress would have desired such a result when it enacted the Procurement Act.[14]

### D. Case Authority: The Affirmative Action Analogy

To bolster its contention that the Procurement Act confers broad authority, the government cites a line of cases upholding executive orders prohibiting employment discrimination and supporting affirmative action programs. *Rossetti Contracting Co., Inc. v. Brennan,* 508 F.2d 1039, 1045 n.18 (7th Cir. 1975), suggests the thrust of this argument:

> It is well established that the procurement process, once exclusively concerned with price and quality of goods and services, has been increasingly utilized to achieve social and economic objectives only indirectly related to conventional procurement considerations. The attenuated relationship to price, quantity or quality, however, does not necessarily limit the power of Congress or the President to condition award of a contract on full and proper compliance. (Citations omitted.)

That court's observation was supported by references to two earlier cases: *Northeast Construction Co. v. Romney,* 485 F.2d 752 (D.C.Cir.1973),[15] and *Contractors Ass'n of*

---

**13.** General Accounting Office, *Authority for President's Program Applying Mandatory Wage and Price Standards to Government Procurement (Executive Order 12092), reprinted in* Hearings, *supra* n.12 at 56.

**14.** The 1946 Moore amendment to the Second War Powers Act, now codified at 50 U.S.C. App. § 645b, also undercuts the defendants' argument that Congress in enacting the Procurement Act intended implicitly to authorize a system of price controls such as contained in Executive Order 12092. That amendment specified that nothing in that Act or any other federal statute, with certain stated exceptions, "shall be construed to authorize the establishment by any officer or agency of the Government of maximum prices for any commodity

. . . ." Under principles of statutory construction, the Moore amendment "prohibit[s] the finding of implicit, as opposed to explicit, power in any federal statute to establish 'maximum prices' for 'any commodity,' whether that commodity is sold solely within the private sector or to the Government." Department of Justice, *Legality of Applying Wage and Price Standards in Government Procurement, reprinted in* Hearings, *supra* n.12 at 431.

**15.** *Northeast Construction* did not address the issue of the validity of the executive order program *per se* but rather whether a particular bid was responsive to Department of Labor procurement regulations. In so doing the court observed that the procurement power had been used to achieve nonprocurement objectives,

*Eastern Pa. v. Secretary of Labor,* 442 F.2d 159 (3d Cir.), *cert. denied,* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971), the central case in the defendants' analysis. However, neither case supports as broad a reading of the procurement power as *Rossetti* at first blush suggests. Neither held that the procurement power alone was sufficient authority for the executive order affirmative action program. An evaluation of the *Rossetti* language and the use of the Procurement Act generally as a vehicle to achieve wage and price stability by means of contract debarment was included in a thoughtful opinion of the Congressional Research Service. That memorandum says of the *Rossetti* comment:

> [I]t would be grossly misleading if that statement is understood as describing *unilateral executive action.* In fact, a comprehensive study of the Commission on Government Procurement shows that virtually every instance in which the procurement process has been used to achieve unrelated social and economic objectives, it has been authorized by Congress *ab initio* or has been subsequently ratified and approved by legislative action. These have included such diverse programs and purposes as establishing fair wages and working conditions, promoting domestic business and the domestic economy, eliminating unemployment and providing training and job opportunities, establishing fair employment practices, promoting minority business concerns, protecting the environment, and ensuring humane treatment of animals. (Emphasis in original.) [16]

■ The essential distinction is that Congress has taken favorable cognizance of the executive order equal opportunity program in a variety of ways; it has not treated the wage-price program at issue here in similar fashion. After years of acquiescence in the equal opportunity program, Congress in the early 1970's explicitly refused to strike down orders requiring contractors to practice affirmative action. In addition, over the years Congress has steadily and knowingly appropriated funds to carry out the executive orders—a tacit, positive endorsement of these programs. By contrast, in the area of wage and price control, Congress historically has occupied the field, delegating power to the executive branch very sparingly. Nor is there any evidence of tacit congressional approval of the President's current wage-price control programs. Indeed, the evidence is contrary.[17]

This Court does not agree with the defendants that the *Contractors Ass'n* ruling and its underpinnings supply adequate support for the debarment mechanism for the following reasons.[18] The Third Circuit ob-

commenting, "[s]uch social or economic objectives may be sufficiently related to procurement considerations in a broad sense and over the long run to validate use of the procurement power by Congress or the President." 485 F.2d at 760–61. As authority, the court quoted *Contractors Ass'n:* " 'it is in the interest of the United States in all procurement to see that its suppliers are not over the long run increasing its costs and delaying its programs by excluding from the labor pool available minority workmen.' " *Id.* at 761.

**16.** Library of Congress, Congressional Research Service, *Constitutionality of the Wage and Price Program Established by Executive Order 12092,* February 2, 1979, *reprinted in* Hearings, *supra* n.12 at 480–81.

**17.** In the recent one-year extension of the Council on Wage and Price Stability, neither the House nor Senate indicated any approval of Executive Order 12092. Indeed, the House Report stated, that "the committee did not seek to resolve . . . the issue of whether the Executive, in its anti-inflation effort, has exceeded the authority granted by Congress." H.R.Rep. No. 33, 96th Cong., 1st Sess. 3 (1979). *See also* Amicus Memorandum at 44–45. Last fall, before the President had ever issued the Order, the Senate adopted a resolution expressing its view that neither the Procurement Act nor any other statute empowered the President to impose a mandatory system of controls. 124 Cong.Rec. S16781 (daily ed. Sept. 30, 1978). While that resolution admittedly does not have the effect of law, it nonetheless expresses, as its name states, the "Sense of the Senate" on the issue.

**18.** Other cases cited and relied on by the government are *Farmer v. Philadelphia Electric Co.,* 329 F.2d 3 (3d Cir. 1964) and *Farkas v. Texas Instrument, Inc.,* 375 F.2d 629 (5th Cir.),

served that use of the executive order to combat discrimination by government contractors dated back to 1941 and was at the outset "clearly bottomed on the President's war mobilization powers . . . ." 442 F.2d at 169. Indeed, there could have been no connection between the early antidiscrimination executive orders and the Procurement Act since the latter was not passed until 1949. Later, however, as the opinion notes, peacetime Presidents continued the use of such orders and expanded their scope. Executive Order 11246 of 1961 imposed affirmative action obligations on federal procurement contractors and Executive Order 11114 of 1963 extended such obligations to contractors in federally assisted construction contracts. It was the legality of this latter order requiring affirmative action in state construction projects in the Philadelphia area—the so-called Philadelphia Plan—that was at issue in *Contractors Ass'n.*

In holding that the Plan was a lawful exercise of the President's implied authority, the court emphasized that Congress had long been aware of the program and had expressed its approval through the appropriations process. At page 171 the court reasoned:

> When the Congress authorizes an appropriation for a program of federal assistance, and authorizes the Executive branch to implement the program by arranging for assistance to specific projects, in the absence of specific statutory regulations it must be deemed to have granted to the President a general authority to act for the protection of federal interests. In the case of Executive Order Nos. 11246 and 11114 three Presidents have acted by analogizing federally assisted construc-

tion to direct federal procurement. . . . If no congressional enactments prohibit what has been done, the Executive action is valid. Particularly is this so when Congress, aware of Presidential action with respect to federally assisted construction projects since June of 1963, has continued to make appropriations for such projects. . . . [U]nless the Philadelphia Plan is prohibited by some other congressional enactment [which the Court did not find], its inclusion as a pre-condition for federal assistance was within the implied authority of the President and his designees.

The Third Circuit also found evidence "that Congress contemplated continuance of the Executive Order program" in its reference to it in the Civil Rights Act of 1964, as originally enacted, 42 U.S.C. § 2000e–8(d). Pub.L. 88–352, Title VII, § 709(d), 78 Stat. 253, 263. While that section concerned reporting under Title VII and the executive order program, it reveals Congress' recognition of the latter and agreement that it would continue.

In the course of amending Title VII in the early 1970's, Congress approved the substantive content of the executive order program, finding the affirmative action obligations imposed consistent with Title VII. Of particular significance was the Senate's defeat of a series of restrictive amendments offered by Senator Ervin. They were described by Senator Javits, leader of the opposition, as an attack on "the Philadelphia plan and similar plans in other cities, and beyond that, the whole concept of 'affirmative action' as it has been developed under Executive Order 11246 and as a remedial concept under Title VII." 118 Cong. Rec. 1664 (1972). One amendment, which

cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967). As *Contractors Ass'n* points out, however, the language in those cases dealing with the executive order fair employment program was dicta; the cases assumed the validity of the program in order to reach the question whether it gave rise to a private cause of action by a party subject to discrimination. The government also relies on *Eastern States Petroleum & Chemical Corp. v. Seaton,* 163 F.Supp. 797 (D.D.C.1958), which

dealt not with an antidiscrimination executive order but with an order establishing the Voluntary Oil Import Program, which sought to discourage the importation of foreign crude oil. The court, however, found a "dual legal basis" for the order, the Buy American Act and the procurement power. The case is thus consistent with the later cases which have looked to other sources of congressional authorization in addition to procurement when objectives unrelated to procurement are involved.

would have prohibited federal officials from imposing numerical hiring requirements on employers, was defeated amid discussion that it might deprive even the courts of the power to remedy discrimination. *Id.* at 1676. A subsequent and final amendment to curb executive order affirmative action, which did not interfere with the judiciary's power to grant affirmative relief under Title VII, was similarly defeated. *Id.* at 4918.[19] A similar effort in the House to curtail the program was also unsuccessful. 117 Cong.Rec. 32111 (1971).

The House Report on the 1972 Title VII amendments also reflected congressional support for the program, noting its compatibility with Title VII:

> The two programs are addressed to the same basic mission—the elimination of discrimination in employment.

> The obligations imposed on the government contractor by the Executive Order . . . reinforce the obligations imposed by Title VII.

H.R.Rep. No. 238, 92nd Cong., 1st Sess. 15 (1971), U.S.Code Cong. & Admin.News 1972, pp. 2137, 2150.

This recent congressional approval of executive order affirmative action has been recognized by the courts. The Fifth Circuit in 1977 found three legislative bases to sustain the program: the procurement power, the initial enactment of Title VII, and the legislative debates surrounding the 1972 amendments. *United States v. New Orleans Public Serice, Inc.,* 553 F.2d 459, 466–68 (5th Cir. 1977), *vacated on other grounds,* 436 U.S. 942, 98 S.Ct. 2841, 56 L.Ed.2d 783 (1978).[20] At the same time, the court ob-

served that "equal employment goals themselves, reflecting important national policies, validate the use of the procurement power in the context of the Order." 553 F.2d at 467.

■ *Contractors Ass'n,* the cornerstone of the government's defense, suggests that the peacetime antidiscrimination orders "would seem to be authorized by the broad grant of procurement authority" and states without explanation that "[i]n the area of Government procurement Executive authority to impose non-discrimination contract provisions falls in Justice Jackson's first category: action pursuant to the express or implied authorization of Congress." 442 F.2d at 170. But these statements are unsupported dicta. The *Contractors Ass'n* holding itself was much narrower—carefully qualified by reference to the various ways Congress had ratified the executive order program. The Fifth Circuit in *New Orleans Public Service* has pointedly rejected the potentially broad invitation of the *Contractors Ass'n* dicta relying on three statutory bases to uphold the program. The law today simply does not support the argument that the procurement power alone can be used by the President to control incomes.

### E. The History of Wage-Price Controls

In sharp contrast to the initial acquiescence in and ultimate approval of presidential equal employment initiatives, the Congress has always occupied the field of wage and price controls. Delegation of mandatory control power as well as the standards and means by which controls may be insti-

---

**19.** An earlier less conclusive instance of congressional ratification can be found in the 1969 defeat of the so-called Fannin rider to a supplemental appropriations bill, 115 Cong.Rec. 40749, 40921 (1969). *See Comment, The Philadelphia Plan: A Study in the Dynamics of Executive Power,* 39 U.Chi.L.Rev. 723 (1972).

**20.** The issue of the compatibility of the executive order affirmative action program and Title VII is before the Supreme Court. *See Weber v. Kaiser Aluminum & Chemical Corp.,* 563 F.2d 216 (5th Cir. 1977), *cert. granted,* 439 U.S. 1045, 99 S.Ct. 720, 58 L.Ed.2d 704 (1978), in

which the court found a conflict between two programs if the executive order affirmative program were construed to require affirmative action goals of contractors absent a finding of discrimination. The Fifth Circuit decided *Weber* a few months after *New Orleans Public Service. See also* observation in *United States v. East Texas Motor Freight System, Inc.,* 564 F.2d 179, 185 (5th Cir. 1977), that *New Orleans Public Service* recognized that an executive order has the force of law " 'if it is not in conflict with an express statutory provision' (553 F.2d at 465)."

tuted has been carefully limited. On the few and extraordinary occasions when controls have been found necessary, Congress has granted such authority expressly, by positive legislation limited both in scope and particularly in duration. This consistent treatment of controls through specific legislation precludes any inference that Congress has intended to confer control authority by implication. The history of this legislation was presented in the Amicus Memorandum at 34–37 and may be briefly summarized.

In 1942, Congress enacted the Emergency Price Control Act, Pub.L. No. 421, 56 Stat. 23 (1942), tying the need for controls into government contracting by declaring that one of the Act's purposes was to ensure "that defense appropriations are not dissipated by excessive prices." The same year, in the Stabilization Act, Pub.L. No. 729, 56 Stat. 765 (1942), Congress authorized the President to limit wages and agricultural prices. The 1942 congressional enactment and other World War II wage and price legislation carefully delimited the power conferred.[21] In particular, each of the Acts contained specific expiration dates. During the Korean conflict, Congress again authorized wage and price controls in the 1950 Defense Production Act, Pub.L. No. 774, 64 Stat. 798 (1950). Those controls, too, were limited in duration, to meet the needs of the emergency and the authority expired in April, 1953. Pub.L. No. 429, 66 Stat. 306 (1952).

Congress did not enact economic control legislation again until 1970, when it authorized the President to "issue such orders and regulations as he may deem appropri-

ate to stabilize prices, rents, wages, and salaries at levels not less than those prevailing on May 25, 1970" and to make "such adjustments as may be necessary to prevent gross inequities." Economic Stabilization Act of 1970 (ESA), Pub.L. No. 91–379, 84 Stat. 799 (1970). Initially, the Act was given only a six month life, but Congress extended it a number of times, for periods of short duration.

As originally passed the ESA did not contain the elaborate standards and procedural safeguards of previous legislation but later amendments provided for agency review and authorized the promulgation of administrative regulations. Pub.L. No. 92–210, 85 Stat. 743 (1971).[22] Thus in final form the Economic Stabilization Act was, like its predecessors, particularized in both standards and procedures to be applied. In April, 1974, amid growing dissatisfaction with mandatory wage and price controls initiated by President Nixon, the Congress allowed the ESA to expire. In August, 1974, it enacted the Council on Wage and Price Stability Act in its place.

## F. *The Mandatory Nature of the Guidelines*

 The parties agree that the President does not have the power to impose a system of mandatory wage and price controls.[23] Indeed, as just discussed, the history of wage-price legislation demonstrates that Congress has authorized mandatory controls only pursuant to positive legislation. There can be no doubt as to what Congress intended under COWPSA; § 3(b) provides that:

---

**21.** The procedural framework of the World War II controls was sustained in *Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944), and *Bowles v. Willingham,* 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944).

**22.** Congress may have been responding at least in part to the decision in *Amalgamated Meat Cutters & Butcher Workmen v. Connally,* 337 F.Supp. 737, 757 (D.D.C.1971). In response to a union challenge to President Nixon's imposition of a 90-day freeze on prices, rents, wages,

and salaries, the Court sustained the legality of the Act but gave notice that procedural safeguards and standards were essential elements of an economic control program.

**23.** The President has acknowledged that he lacked the legal authority to promulgate mandatory controls. *Transcript of President Carter's White House Breakfast Meeting with Reporters,* Bureau of National Affairs, Daily Report for Executives, November 16, 1978, p. x-1, appendix 3 to Amicus Memorandum.

Nothing in this Act . . . authorizes the continuation, imposition, or reimposition of any mandatory economic controls with respect to prices, rents, wages, salaries, corporate dividends, or any similar transfers.

There is disagreement, however, over the meaning of the word "mandatory." The plaintiffs claim that in using or threatening contract debarment to achieve compliance, the President has established a system of mandatory economic controls. The defendants dispute that claim and respond that the program in principle and practice is voluntary.

In support of their position, the defendants first·look to the controls created by the 1970 Economic Stabilization Act for a definition of "mandatory." That Act, as amended, imposed civil and criminal penalties for violations, empowered the government to seek injunctions against violators, and allowed a private right of action for treble damages as well. Government counsel argue that it is sanctions of this sort that Congress meant to preclude by § 3(b); that Congress' intent was to disavow only such a comprehensive judicially-enforced system of controls rather than prohibit all sanctions in the field.

The OFPP Policy Statement [24] which sets out the debarment procedures does not "enforce" the Council's standards, according to the defendants, but

> merely provides that the government will exercise its right to act as a prudent buyer by restricting its major purchases to those companies which exercise restraint in their price and pay decisions. The OFPP policy statement is safely within the government's rights as a purchaser of goods and services, for like private individuals and businesses, the government has "the unrestricted power . . . to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127, 60 S.Ct. 869, 84 L.Ed. 1108 (1940) (other citations omitted).

Defendants' Motion For Summary Judgment at 25–26. However, the authority of the executive to determine contractual conditions was not at issue in *Perkins*. Rather, the case presented a challenge to executive action taken pursuant to a congressional enactment and not an executive order.

In opposition, plaintiffs and amici argue that to be "mandatory," controls need not merely mirror those in force under the Economic Stabilization Act. They point out that by its terms, § 3(b) disavows "any" mandatory economic controls and observe that since Congress had already allowed the ESA to expire and since § 3(a) gave the Council no authority enforceable through the courts, "it is inherently unlikely that Congress would have added that general prohibition if all that was feared was judicially imposed sanctions." Plaintiffs' Reply Memorandum at 4.

■ There is no evidence that judicial enforcement was the danger Congress sought to proscribe in § 3(b) of COWPSA. On the contrary, ample legislative history demonstrates congressional intent to remove government from the realm of controls, allowing private parties to make their own pay and price decisions. Congress would permit the government to cajole, not to compel. Senator Tower made clear what was envisioned:

> I approach this legislation with some amount of apprehension for many may perceive the action which we take today to be the first step back toward controls. If this view is pervasive, it could further exacerbate our inflationary problem by stimulating anticipatory wage and price increases and hence further the prospect of imposition of future controls. Congress must demonstrate that this is not

---

24. *See* discussion at page 92 *supra*.

our intent. No economic authority is being granted or authorized.

. . . . .

The provisions embodied in the Council on Wage and Price Stability Act of 1974 represent a license by the Congress to the President to exercise his influence to arrest the inflationary spiral. To this end *I believe we should draw the line on acceptable amendments to this legislation where the discipline of an agency or a council of the Federal Government begins to replace the discipline of the marketplace. The discipline of the marketplace should be the final arbitrator of wages and prices.*

120 Cong.Rec. 28883 (1974) (emphasis added).

Congress did reject, as he urged, the efforts to extend wage and price control authority, and instead enacted COWPSA which, as the Senate Report observed, created only a "task force on inflation" with power "to monitor the economy generally." The Report emphasized that the bill "would grant no mandatory or standby control over the economy." S.Rep. No. 1098, 93d Cong., 2d Sess. 1 (1974), U.S.Code Cong. & Admin. News 1974, pp. 4514, 4515.

In their second definitional argument, the defendants deny that the wage-price program is mandatory because compliance is optional. They concede that access to government contracts may be an "important consideration" to an individual company but conclude that debarment is not a mandatory sanction since there is no "legal right" to a government contract:

> Of course, firms that do not observe the standards will be unable to bid on government contracts or first-tier subcontracts in excess of $5 million. This may or may not be an important consideration for an individual company. In any event, no company has a legal right to a government contract, and none can be heard to complain if it voluntarily takes actions which the company, on balance, believes to be advantageous, but which renders it

ineligible for certain government contracts.

Defendants' Motion for Summary Judgment at 26.

For the defendants to urge this position is simply to blink at reality. The fact remains that if a company seeking a government contract fails to comply with the guidelines, it faces a very genuine possibility of being declared ineligible to compete. It would be difficult to convince a business executive or anyone faced with a decision to comply or lose a substantial government contract that such a program is voluntary. The debarment threat serves as an effective lever and a none too subtle deterrent to any company which does business with the government. The government annually contracts for many billions of dollars in goods and services. These contracts represent a substantial share of the business of many companies. An element of compulsion is inherent and ever present. Further, the President's program is unlimited in duration and scope and carries with it the possibility of expanded coverage of both business firms and a larger segment of the national labor force. The Executive Order's purpose and intended effects remove it from the benign jawboning efforts authorized by COWPSA or from the efficiency and economy objectives of the Procurement Act. Finally, as to the defendants' argument that no one has a right to a government contract, the plaintiffs do not assert such a right. The issue is rather whether the President has the power to control incomes through the procurement process.

Defendants concede the plaintiffs' affidavits show that "some employers, when bargaining with unions, have attempted to convince the unions to settle for wage increases within the Council's pay standard." Defendants' Motion for Summary Judgment at 27. The affidavits show much more. They demonstrate that companies have felt compelled to comply with the guidelines and that wage settlements in collective bargaining agreements have been accordingly

limited by the threatened loss of government contracts for noncompliance.[25]

In summary, the defendants' assertion that the guidelines are somehow voluntary has little merit and upon close analysis must fall. A mandatory program is distinguished by the fact that failure to comply brings a penalty. One may ordinarily escape the effect of a regulation aimed at controlling activity by ceasing the activity. But one who takes that course can hardly be said to be acting voluntarily. To distinguish judicial enforcement from enforcement by means of a debarment mechanism misses the point. The program imposes a real penalty. If an offending company is actually debarred, the penalty is a loss of sales and income, and for its workers a possible loss of jobs. But the program imposes sanctions, and restricts possible wage gains and penalties on workers such as the plaintiffs in this case even without actual debarment. The threat of ineligibility for or loss of government contracts is for some companies the most severe possible sanction the government could impose.

## CONCLUSION

There is no dispute that inflation is a vexing and festering domestic problem. It has plagued, without discrimination, all segments of our population and its impact has been felt in every facet of our political economy. Because the situation has worsened in the last several years, the President's attention and efforts have necessarily been directed to resolution of the problem.

The efforts of the President, however well-intentioned and commendable they may be, must be predicated upon executive power conferred by the Constitution or by a congressional enactment pursuant to the Constitution. Article 1, § 1 of the Constitution provides, "All legislative Powers herein granted shall be vested in a Congress of the United States . . . ." Article II, § 3 provides that the President "shall take Care that the Laws be faithfully executed . . . ." The constitutional separation of powers principle cannot be ignored. As Justice Jackson concluded in discussing his third category of power in which the Executive exercises power incompatible with the will of Congress:

> Presidential claim to . . . power . . . must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system.

*Youngstown Sheet & Tube Co.*, 343 U.S. at 638, 72 S.Ct. at 871.

President Carter has exceeded the authority conferred on him by the Constitution by seeking to control incomes and thereby prices through the procurement power. The program establishes a mandatory system of wage and price controls, unsupported by law. The Court, therefore, reluctantly concludes that the President's anti-inflation program cannot be sustained.[26]

The plaintiffs' motion for summary judgment is granted and the defendants' motion for summary judgment is denied. Counsel for plaintiffs shall present an appropriate order.

---

**25.** *See e.g.,* Affidavits of George Hutchens, James G. Mauro, Jr., Robert E. Stander, and Joseph O'Hare, Plaintiffs' Motion for Summary Judgment.

**26.** In light of these conclusions, it is not necessary to address the contention that the President's program interferes with the congressionally endorsed policy of free collective bargaining.

# APPENDIX A

## THE PRESIDENT

[3195-01-M]

**Executive Order 12092** November 1, 1978

### Prohibition Against Inflationary Procurement Practices

By the authority vested in me as President and as Commander in Chief of the Armed Forces by the Constitution and statutes of the United States of America, including Sections 2(c) and 3(a) of the Council on Wage and Price Stability Act, as amended (12 U.S.C. 1904 note) and Section 205(a) of the Federal Property and Administrative Services Act of 1949, as amended (40 U.S.C. 486(a)), and in order to encourage noninflationary pay and price behavior by private industry and labor, and to provide for the procurement by Executive agencies and Military Departments of personal property and services at prices and wage rates which are noninflationary, it is hereby ordered as follows:

1-101. The Chairman of the Council on Wage and Price Stability shall:

(a) Monitor company pay and price practices in order to determine compliance with the standards set forth in Section 1-102 of this Order;

(b) Promulgate regulations and guidance to further define these standards, and provide for appropriate exemptions and exceptions;

(c) Publish, or cause to be published, in accordance with procedures designed to ensure fairness and due process, the names of individuals or companies which are not in compliance with the standards;

(d) Promulgate procedures to be used in proceedings before the Council on matters pertaining to the standards, and take such other action as may be necessary and consistent with the purposes of this Section.

1-102. Noninflationary wage and price behavior shall be measured by the following standards:

(a) For prices, noninflationary price behavior is the deceleration by companies of their current rate of average price increase by at least 0.5 percentage points from their historical rate of annual price increase during 1976-1977 except where profits have not increased.

(b) For pay, noninflationary pay behavior is the holding of pay increases to not more than 7 percent annually above their recent historical levels.

(c) These standards, which shall be further defined by the Chairman of the Council on Wage and Price Stability, shall be subject to certain limitations and exemptions as determined by the Chairman.

1-103. In order to ensure economy and efficiency in government procurement, the head of each Executive agency and Military Department shall ensure that their contracts incorporate, on and after January 1, 1979, a clause which requires compliance by the contractor, and by his subcontractors and suppliers, with the standards set forth in Section 1-102 of this Order.

1-104. Each Executive agency and each Military Department shall comply with the directions of the Administrator for Federal Procurement Policy, who, in accord with Section 6 of the Office of Federal Procurement Policy Act (41 U.S.C. 405), shall be responsible for the overall direction of the implementation of Section 1-103 including the issuance of regulations and procedures for determining exceptions and granting exemptions.

*Jimmy Carter*

THE WHITE HOUSE,
*November 1, 1978.*