Lerch Unemployment Compensation Case.
Hershey Estates, Appellant, *v.* Unemployment
Compensation Board of Review.

Argued September 17, 1959. Before GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ. (RHODES, P. J., and HIRT, J., absent).

*Samuel A. Schreckengaust, Jr.,* with him *Francis B. Haas, Jr.,* and *McNees, Wallace & Nurick,* for employer, appellant.

*Sydney Reuben,* Assistant Attorney General, with him *Anne X. Alpern,* Attorney General, for Unemployment Compensation Board of Review, appellee.

*Bernard N. Katz,* with him *Meranze, Katz and Spear,* for claimants, intervening appellees.

OPINION BY GUNTHER, J., November 11, 1959:

In this unemployment case, the claimants were employed by the Hershey Estates, consisting of approximately 31 various divisions of the chocolate plant and other enterprises located at Hershey, Pennsylvania. Claimants were represented for collective bargaining by Local 464 of the Bakery and Confectionery Workers' International Union of America, AFL-CIO. For a year preceding September 16, 1957, the employer and the union had entered into a collective bargaining agreement which provided that either party could terminate the contract by giving the other party sixty days' advance written notice.

On July 15, 1957, the employer sent a registered letter to the office of the union, informing it that the employer intended to terminate the existing contract at midnight, September 16, 1957 but stating that it was ready and willing to meet for the purpose of negotiating new contracts. Based upon this letter, the union and the employer met on a number of occasions, both sides submitted proposals and counter proposals,

but no agreement was reached.  On September 13, 1957, the employer placed the following notice on the bulletin boards of all divisions in its operation: "This division will be open for any of its employees who cares to come to work—Regardless of what happens Monday—midnight."

At the last meeting held in the early evening of September 16, 1957, the union suggested that the contract be extended on a day to day basis to permit more time for negotiations.  This suggestion was rejected by the employer and the meeting finally terminated. Later that evening, the union then submitted the employer's proposals to its membership which voted to reject the offer and, when the collective bargaining agreement expired at midnight, pickets were posted at the various operations of the employer.

On September 17, 1957, the employer sent a registered letter to the union in which it stated that "all divisions of the Hershey Estates are and have been open and operating and that work is available for all employees."  The next day, a similar notice was printed in the Lebanon Daily News and the Lebanon Daily Times.  On September 27, 1957, this same notice was again published in the Hershey News and in other newspapers of general circulation in and around Hershey, Pa.  The union, on the other hand, openly stated that it was on strike and referred to the strike on picket signs as well as in the course of many statements which it issued during the period in question.

On September 17, 1957, certain members of the striking employes applied for unemployment compensation benefits.  On January 6, 1958, the Bureau of Employment Security notified the claimants that their claims had been rejected and on January 16, 1958, the present claimants, Robert C. Lerch and Josephine C. Giuffre, submitted their petitions for appeal.  The ref-

eree, after hearing and taking of testimony, allowed benefits for the weeks ending September 30 and October 7, 1957. On May 3, 1958, the employer took an appeal from the referee's decision to the board which, on September 16, 1958, affirmed the referee's decision. Pursuant to the employer's request for reargument, the board vacated its order of September 16, 1958, and ordered reargument before it. On February 11, 1959, the board reinstated its former decision, ruling that the actions of the employer constituted a lockout within the meaning of section 402(d) of the Unemployment Compensation Law, 43 P.S. 802(d). This appeal followed.

The only question raised on this appeal is whether the action of the employer in refusing to agree to the union's request that the existing contract be extended on a day to day basis constituted a lockout within the meaning of the Unemployment Compensation Law.

We are not unmindful of the frequent pronouncements made by us to the effect that the facts as found by the board, after considering all of the evidence and the reasonable inferences to be drawn therefrom, if supported by competent testimony, are binding upon us. This pronouncement has been repeated so often that the citation of authority becomes unnecessary. The legal conclusions to be drawn from such facts and inferences, however, are always subject to review, especially when the evidence does not support either the facts or the legal conclusions drawn therefrom.

The facts of the instant case fully support a strike among the members of the union rather than a lockout on the part of the employer. The various publicity material issued by the union to its members definitely indicated an intention to strike: "It's better to starve idle than to starve working. No Contract—No Work. Midnight, September 15, 1957." All the picket signs

clearly indicated that the action of the employes was a strike for higher wages and better working conditions. On September 28, 1957, the union issued a release to its members in which it reported "that the strike is 100% a success!" In this same release the union refers to the fact that it is waiting for a ruling from the bureau on whether "we will be entitled to collect Unemployment Compensation benefits. We have instituted a lawsuit against the Company and have an optimistic outlook for its future." Nowhere did the employes or the union refer to a lockout except in these proceedings to obtain benefits. On the other hand, the employer stated both by notices, letter and advertisements that all of its divisions would remain open and that work would be available for all employes. The positive testimony of the only witness who was called to testify before the referee stated that all the divisions of the employer continued to operate after midnight, September 16, 1957; that there were no changes in the wages or working conditions which existed prior to September 16, 1957; that about one-third of the employes continued to work but that, because of the limited labor force, temporary job classifications had to be made. No testimony was produced to show that during this period of operation, pre-existing conditions were changed. If such were the fact, the union would have had little difficulty in showing this through the testimony of its employes who continued to work during the strike.

In *Morris Unemployment Compensation Case*, 169 Pa. Superior Ct. 564, 83 A. 2d 394, we held that in all work stoppage cases, the first question to determine was whether the employes might, had they so desired, have continued working under the existing terms and conditions of employment. If they have the opportunity to do so but choose, instead, to suspend work with a view of improving their working conditions, the

responsibility for their unemployment rests with them and the stoppage which ensues is not a lockout within the meaning of the law. In *Burleson Unemployment Compensation Case,* 173 Pa. Superior Ct. 527, 98 A. 2d 762, we said: "The gist of a lock-out is an employer's withholding of work from his employes in order to gain a concession from them. It may be evidenced by closing the plant or by other acts which evince the purpose of forcing employes to accept onerous terms of employment. But where, as here, the plant remains open, the employes are requested to return to work, and full employment is available to all employes at the wages and on the terms of employment prevailing at the time the work stoppage occurred, a labor dispute or a strike is not transformed into a lock-out." In *Hogan Unemployment Compensation Case,* 169 Pa. Superior Ct. 554, 83 A. 2d 386, a similar situation to the instant case was considered and we there held that since the plant was open and operating, and that work was being performed by other workers, that access to it was not forbidden except by the union's pickets, and if there had been any doubt about the employer's position a simple inquiry would have dispelled it, such a situation could not be considered a lockout.

The board, in arriving at the conclusion in this case, took a negative and what we consider to be an erroneous approach. In effect, it concluded that since the employer did not expressly announce that work would be available under the same terms and conditions which prevailed prior to the termination of the agreement, the work actually offered was not under the same terms and conditions and therefore a lockout. However, the evidence produced and the reasonable inferences therefrom preclude such assumption. Considering the type of operations here involved, an offer by the union to extend the contract on a day to day basis is unreasonable and would subject the employer to the

sudden and unilateral action of the union in calling a work stoppage at a time when such action would prove to be extremely harmful to the overall operations. The refusal to go along with such an offer does not transform a strike into a lockout. Cf. *Gray Unemployment Compensation Case,* 187 Pa. Superior Ct. 425, 144 A. 2d 856. The work stoppage was caused by the refusal of certain members of the union to cross the picket line. This was the final cause and not the refusal of the employer to furnish work on the basis of pre-existing terms and conditions.

Decision reversed.