480 A.2d 1000

**LOCAL 730, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPE-FITTING INDUSTRY, et al.**

v.

**COMMONWEALTH of Pennsylvania, UNEMPLOYMENT COMPENSATION BOARD OF REVIEW.**

Supreme Court of Pennsylvania.

Argued Oct. 27, 1983.

Reargued April 12, 1984.

Decided July 23, 1984.

Sondra T. Berman, Arthur Berman, Harrisburg, Lawrence T. Zimmerman, Washington, D.C., Sheldon Rosenberg, Scranton, for appellant.

Robert D. Mariani, Scranton, for Local 730.

Richard Cole, Charles Hasson, Asst. Attys. Gen., for Com., UCBR.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

NIX, Chief Justice.

We are again faced with a question of whether employees involved in a work stoppage are ineligible for unemploy-

ment compensation benefits under the terms of section 402(d) of the Pennsylvania Unemployment Compensation Law, Act of December 5, 1936, P.L. 2897, *as amended*, 43 P.S. § 802(d) (1964). The specific issue is whether our test for ineligibility as set forth in our decision in *Vrotney Unemployment Compensation Case*, 400 Pa. 440, 163 A.2d 91 (1960) is to be modified where the employer's unilateral action altering the status quo represented a "benefit" to the employees.

The instant dispute arose when 258 employees,[1] represented by Local 730 of the United Association of Journeymen and Apprentices of the Plumbing and Pipe-Fitting Industry ("Union"), who had been employed by appellant Trane Company ("Employer") prior to a work stoppage, were denied unemployment compensation benefits by the Office of Employment Security on the ground that their unemployment was the result of a labor dispute other than a lockout. 43 P.S. § 802(d) (1964). That decision, affirmed by the Unemployment Compensation Board of Review ("Board"), was appealed to the Commonwealth Court. A three-judge panel of that court, one judge dissenting, reversed and remanded to the Board for the computation of benefits. *Local 730, United Association of Journeymen and Apprentices of Plumbing and Pipe-Fitting Industry v. Commonwealth, Unemployment Compensation Board of Review*, 63 Pa.Commw. 195, 437 A.2d 1055 (1981). We granted allocatur and now affirm.

## I.

The relevant facts, as determined by the Board's referee, may be summarized as follows. Shortly before the expiration of an existing collective bargaining agreement ("Agreement"), the Employer and the Union began negotiations on a new contract. Although the parties were unable to reach

---

1. Over 550 employees actually participated in the work stoppage. Claims for unemployment compensation were initiated by 258 claimants and a mass appeal was taken from the action of the Office of Employment Security. The case of one of the strikers, Robert Semian, was treated as representative of the cases of all of the claimants.

a new agreement prior to expiration, the Union offered to continue working for a reasonable period of time under the terms and conditions of the expired Agreement pending the outcome of the ongoing negotiations. The Employer permitted the employees to continue to work under the terms and conditions of the Agreement until June 15, 1979. On that date, during a meeting with Union representatives, the Employer presented a list of changes in economic terms and conditions of employment, including an across-the-board hourly wage increase and enhanced fringe benefits, which it intended to implement the following Monday (June 18). The Union refused to present the list to its membership for a vote, and the Employer implemented its proposals as scheduled. The employees continued to work under these changed terms and conditions until July 20, 1979. On the following day, the Union membership, having been apprised of the Employer's economic proposals, voted to reject them and to stop work. The parties ultimately arrived at a new collective bargaining agreement on October 9, and work resumed on October 10, 1979.

The dispute, during the negotiations, centered on wages and fringe benefits. It appears that the parties were tentatively in agreement as to the non-economic items prior to the April 2 expiration date. The altered status unilaterally imposed by the Employer, effective June 18, represented the wage and fringe benefit increases which were part of the package offered by the Employer and rejected by the Union at that point in the negotiations.[2] Between June 18 and July 21 the employees remained at work under the improved wage and fringe levels. This change in status was placed before the Union membership on July 21, at which time the Union membership rejected the offer and the work stoppage began.

## II.

Section 402(d) of the Pennsylvania Unemployment Compensation Law provides in pertinent part as follows:

**2.** These benefits consisted of a 55 cent per hour across-the-board wage increase, and increases in insurance, vacation and pension benefits.

An employe shall be ineligible for compensation for any week—

(d) In which his unemployment is due to a *stoppage of work, which exists because of a labor dispute (other than a lock-out)* at the factory, establishment or other premises at which he is or was last employed: ....

43 P.S. § 802(d) (1964) (emphasis supplied).

The test for determining whether a work stoppage is the result of a lockout or a strike is well-established:

Have the employees offered to continue working for a reasonable time under the preexisting terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the preexisting terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a 'lockout' ....

*Vrotney Unemployment Compensation Case, supra* 400 Pa. at 444–445, 163 A.2d at 93–94 (1960).

*Accord, Fairview School District v. Commonwealth, Unemployment Compensation Board of Review,* 499 Pa. 539, 454 A.2d 517 (1982); *Borello v. Unemployment Compensation Board of Review,* 490 Pa. 607, 417 A.2d 205 (1980); *Unemployment Compensation Board of Review v. Sun Oil Co.,* 476 Pa. 589, 383 A.2d 519 (1978); *Philco Corporation v. Unemployment Compensation Board of Review,* 430 Pa. 101, 242 A.2d 454 (1968).

The rationale for employing this test to determine eligibility for benefits under section 402(d) was explained by the *Vrotney* Court as follows:

In the very delicate and sensitive negotiations which are involved in the development of a new collective bargaining agreement to replace one that is nearing its expiration, all parties must be sincere in their desire to maintain the continued operation of the employer's enterprise. The law contemplates that collective bargaining

will be conducted in good faith, with a sincere purpose to find a basis for agreement. Neither an adamant attitude of "no contract, no work" on the part of the employees, nor an ultimatum laid down by the employer that work will be available only on his (employer's) terms, are serious manifestations of a desire to continue the operation of the enterprise.

*Id.* 400 Pa. at 443–444, 163 A.2d at 93.

As this Court stated in *Philco Corporation v. Unemployment Compensation Board of Review, supra:*

Since the purpose of our unemployment compensation system is to compensate an individual when work has been denied him through no fault of his own, logically the test of whether a work stoppage resulted from a strike or a lock-out requires us to determine which side, union or management, first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing.

*Id.* 430 Pa. at 103, 242 A.2d at 455 (1968).

When "the work stoppage takes the *form* of a strike, the burden is upon the union to show that it made the initial 'peace' move by offering to continue the status quo." *Id.*, 430 Pa. at 104, 242 A.2d at 456 (emphasis in original; citations omitted). Here it is asserted that the Employer's unilateral action of June 18 did in fact disturb the status quo and, therefore, the burden upon the Union has been satisfied. The challenge raised by the Employer questions the premise of this argument, to wit, whether the company's action did constitute a disruption of the status quo.

In the instant case, the evidence establishes that the Union employees offered to continue and did continue to work under the expired Agreement pending contract negotiations. It is clear that the first change in this status resulted from the Employer's unilateral decision to change the wage and fringe benefits on June 18. Thus, a question is raised as to whether a disturbance of the status quo envisioned under the *Vrotney* test necessarily requires a detriment to the other party. The Employer vigorously

argues that the change that resulted in increases in wages and fringe benefits should not be construed as disturbing the status quo.

Moreover, we are urged to distinguish this situation from the traditional setting where an employer unilaterally institutes detrimental wage changes. The Employer contends that its motive was not insidious or coercive, but rather emanated from a "desire to benefit the employees by taking advantage of the window in the wage guidelines which otherwise would have barred increases of that magnitude." [3]

The effect of the latter argument is to interject a good faith element in the *Vrotney* formula. The initial acceptance of the *Vrotney* standard was based on its easy application on the administrative level and at the same time it served the basic policy concerns involved. *Vrotney* was designed to encourage the continuation of the work relationship under terms previously agreed to by the parties during that difficult period between the expiration of the old agreement and before the new terms of employment had been agreed upon. *Fairview School District v. Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, supra* 499 Pa. at 546, 547, 454 A.2d at 521; *Unem-*

---

**3.** The attempt to explain its reasons for taking the June 18 action is as follows:

> The Company and Union were negotiating at a time when President Carter's wage and price guidelines, limiting wage increases to seven (7) percent, were in effect. The Company, which was a very large Federal contractor, ran the risk of severe sanctions it if [sic] exceeded the wage guidelines. However, shortly before June 15 the guidelines had been deemed unenforceable by the United States District Court for the District of Columbia, *AFL–CIO v. Kahn*, 472 F.Supp. 88 (1979), and the matter was pending review by the Court of Appeals. The Company offered its proposal when it did because it believed that it would have to exceed the guidelines in order to obtain a contract with the Union, and it had the opportunity to do in light of the hiatus created by the Court's decision.

Appellant's brief at 8, n. 7.

> Indeed, had the Company delayed even a week, that window would have been shut. On June 22, four days after the increases were implemented, the Court of Appeals for the District of Columbia reversed the District Court's decision, *AFL–CIO v. Kahn, supra.*

*Id.* at 20, n. 10.

*ployment Compensation Board of Review v. Sun Oil Co.,* *supra* 476 Pa. at 595, 383 A.2d at 522; *cf. Borello v. Unemployment Compensation Board of Review, supra* 490 Pa. at 612, 417 A.2d at 208 (1980). Moreover, the administrative units involved in the compensation eligibility decision would have little difficulty in resolving the simple factual question of who first departed from the terms of the expired agreement. *Unemployment Compensation Board of Review v. Sun Oil Co., supra* 476 Pa. at 598, 383 A.2d at 522. Once we complicate that decision with requirements of ascertaining the good faith or the justification of a party altering the former terms, we create a standard infinitely more difficult to administer, without a corresponding benefit being derived for such a modification.[4]

Equally as cumbersome is the addition of a requirement that the unilateral change by one of the parties must inure to the detriment of the other. The determination of what is a "benefit" is a much more complex one than it may appear at first blush. The coercive effect of well-timed unilateral increases in benefits by an employer has been aptly described by the United States Supreme Court as "the suggestion of a fist inside the velvet glove." *N.L.R.B. v. Exchange Parts Company,* 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964). The potential of such a "carrot on the stick" approach as a device to erode the resolve of the employees during negotiations is readily apparent. *See, e.g., J.P. Stevens & Co., Inc. v. N.L.R.B.,* 623 F.2d 322, 326 (4th Cir.), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1980); *N.L.R.B. v. J.H. Bonck Co.,* 424 F.2d 634, 638 (5th Cir.1970); *N.L.R.B. v. Stafford Trucking, Inc.,* 371 F.2d 244, 250 (7th Cir.1966); *cf. N.L.R.B. v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962).

**4.** Appellant's protestations of taking its unilateral action of June 18 because of its concern for the interests of the employees ring hollow under the facts of this case. Once the employees representative was aware of the possible consequences of the wage and price guidelines upon their negotiation posture and then rejected the offer, it stretches credulity to believe that appellant's insistence was motivated solely by its concern for the bargaining position of the employee.

██ In spite of the fact that the Employer was unquestionably the party which "first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing[,]" *Philco Corporation v. Unemployment Compensation Board of Review, supra* 430 Pa. at 103, 242 A.2d at 455, the Employer attempts to shift the onus of the *Vrotney* standard to the Union. The Employer argues that the continuation of work by the Union membership for a thirty-three day period after the Employer's unilateral implementation of wage and benefit increases and the employees' failure to protest those changes evidences the Union's acquiescence in a "new status quo." Under this theory the Union's ultimate work stoppage is to be viewed as a refusal to maintain this "new status quo" for a reasonable time. While a modification by mutual agreement of terms and conditions of employment pending the outcome of on-going negotiations would not be inconsistent with the objectives of *Vrotney*, the instant record does not support the existence of such an agreement. The Union's negotiators explicitly rejected the Employer's proposals prior to implementation and declined to present them to the Union membership. The employees' tacit acceptance of paychecks which reflected an hourly wage increase does not in itself support the conclusion that the Union agreed to or that the employees were even aware of the numerous changes in annual insurance, vacation and pension benefits implemented by the Employer. Moreover, the time elapsed between the implementation of those changes and the Union's work stoppage is insufficient to establish an agreement. The Union's representatives clearly required sufficient time in which to ascertain the consensus of the membership regarding the difficult decision whether or not to stop work. Further, the Employer's implementation of its changes did not signal an end to pre-strike contract negotiations. Toward the close of the thirty-three day period in question, the parties conducted a negotiation meeting at which the Union representatives agreed to submit the Employer's proposals to the membership. The possibility that a settlement might still be

reached would further justify the Union's slowness to declare a work stoppage. The evidence supports the conclusion that the parties' positions were not so far apart that such an expectation would have been unreasonable. On these facts, acceptance of the Employer's "acquiescence" theory would encourage a union to call a work stoppage upon the implementation of any unilateral change by an employer in order to protect its membership's right to unemployment compensation. Such a rule would defeat *Vrotney's* crucial objective of encouraging the continuation of the employment situation during good faith negotiations.[5]

The mire that will result from a deviation of the well defined *Vrotney* standard argues most strongly against the suggested modifications. In *Unemployment Compensation Board of Review v. Sun Oil Company of Pennsylvania, supra,* we rejected a modification of the rule which would require a finding that the Union work stoppage was motivated *solely* by the employer's failure to maintain the status quo.

> Such a rule would compel the Unemployment Compensation Board of Review and the Commonwealth Court to fathom underlying, subjective motivations for a work stoppage and would thus undermine the clarity and relative predictability embodied in the standard set forth in our *Vrotney* and *Philco Corp.* decisions. Additionally, the rule of *Vrotney* and *Philco Corp.* tends to encourage employers and employees alike to maintain the status quo while negotiating a new agreement. The departure from

5. Nor can it legitimately be argued that the *Vrotney* rule is unfair to the Employer in that it could conceivably require the employer to continue under the terms of the preexisting contract into perpetuity. *Vrotney* by its express language qualified the length of time during which this status quo must be maintained by stating: "has the employer agreed to permit work to continue for a reasonable time under the preexisting terms and conditions of employment...." *Vrotney Unemployment Compensation Case,* 400 Pa. 440, 444, 163 A.2d 91, 93 (1960). Where it is evident that an impasse has been reached or good faith bargaining is impossible, *Vrotney* by its own terms is inapplicable.

this rule, urged by Sun Oil, would weaken this salutary effect.

*Id.* 476 Pa. at 595, 383 A.2d at 522.

More recently we rejected a Union's claim that the extention of the terms and conditions of the expired collective bargaining contract should include a step-up in pay based upon an additional year of service beyond the salary rate established for the last year of the expired contract. *Fairview School District v. Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, supra.*

■ It must be emphasized that *Vrotney* attempts to maintain the employment relationship during the difficult and delicate period following the expiration of the prior collective bargaining agreement and during the negotiations for one to replace it. In encouraging the continuation of employment during this period, the *Vrotney* standard avoids the economic insecurity due to unemployment which is the fundamental objective of the Unemployment Compensation Law.

Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of the Commonwealth....

43 P.S. § 752 (1964).

In addition, the rule is designed to foster a climate, during the period between contracts, conducive to good faith negotiations on an equal basis. *Fairview School District v. Commonwealth of Pennsylvania Unemployment Compensation Board of Review, supra* 499 Pa. at 547, 454 A.2d at 521. This objective also serves to foster the continued maintenance of the employment relationship. The Employer's suggested modifications of the *Vrotney* rule in no way further these objectives, but rather pose a serious threat to its present efficacy.

■ We must therefore conclude that there was a disruption of the status quo as a result of the Employer's actions on June 18. We also are satisfied that this disruption was of the type envisioned by the *Vrotney* rule. Moreover, the unilateral character of the Employer's action of June 18

was not transformed into a mutual agreement simply because the Union waited thirty-three days before the work stoppage.

Accordingly, the order of the Commonwealth Court is affirmed.

McDERMOTT, J., concurs in the result.

HUTCHINSON, J., filed a dissenting opinion in which FLAHERTY, J., joined.

HUTCHINSON, Justice, dissenting.

The facts of this case, as found by the Referee,[1] plainly establish that the cause of this work stoppage was a strike begun by Trane's employees and not a lockout by Trane. Dissatisfied with the improved conditions the employer instituted two and one-half months after their old contract had expired, under which improved conditions they had worked for 33 days, these workers withheld their labor. Therefore, I would reverse Commonwealth Court and reinstate the order of the Unemployment Compensation Board of Review denying benefits to the employees.

The Referee determined that the parties were bound by a collective bargaining agreement which was effective from June 26, 1976 until its expiration date, April 1, 1979. Between February 27, 1979 and March 29, 1979 the Union and Employer held many bargaining sessions but failed to reach agreement. At the collective bargaining session on March 29, 1979, the Union's chief negotiator submitted a written offer to the Employer, Trane, to continue working for a reasonable period of time under the terms and conditions of the old contract after it expired on April 1, 1979. Although the Employer's negotiator indicated this offer was not agreeable, the employees did report for work on April 2, 1979 and continued to work under the terms of the expired contract until June 18, 1979, a period of two and one-half

1.  The Unemployment Compensation Board of Review agreed with the Referee's determinations and affirmed his decision in a brief statement and order.

months. During that time, the Employer continued to observe and maintain all of the provisions of the expired contract.

At a collective bargaining session on June 15, 1979 the Employer presented a list of changes to the union's negotiating team. Each one of these changes improved the working conditions of the men in the unit. None made them worse.[2] The Union's negotiating team refused to submit the changes to the Union's membership for a vote. On June 18, 1979, the Employer implemented the proposals, including across-the-board hourly wage increases and an improved benefit package.[3]

**2.** Although I do not believe the federal law of unfair labor practices controls our Unemployment Compensation Law's definition of "lockout," there is not a hint in this record that the Employer's implementation of these beneficial changes was an unfair interference with the rights the federal Labor Management Relations Act guarantees to the workers or their Union. Indeed, the Employer's actions appear consonant with federal labor law. Specifically, the United States Supreme Court has distinguished the increases at issue here from unilateral increases higher than any offer submitted to the union during negotiations, the implementation of which demonstrates the employer's refusal to bargain in good faith. For example, in *N.L.R.B. v. Crompton-Highland Mills, Inc.,* 337 U.S. 217, 224–25, 69 S.Ct. 960, 963–64, 93 L.Ed. 1320 (1949), after holding unilateral implementation without presentation across the table is an unfair labor practice, the Court observed that:

> We do not here have a unilateral grant of an increase in pay made by an employer after the same proposal has been made by the employer in the course of collective bargaining but has been left unaccepted or even rejected in those negotiations. Such a grant might well carry no disparagement of the collective bargaining proceedings. Instead of being regarded as an unfair labor practice, it might be welcomed by the bargaining representative, without prejudice to the rest of the negotiations. See *Re W.W. Cross & Co.* 77 NLRB (F) 1162; *Re Exposition Cotton Mills Co.* 76 NLRB (F) 1289; *Re Southern Prison Co.* 46 NLRB (F) 1268.

See also *N.L.R.B. v. Katz,* 369 U.S. 736, 746, n. 12, 82 S.Ct. 1107, 1113, n. 12, 8 L.Ed.2d 230 (1962); *Gulf States Manufacturers, Inc. v. N.L.R.B.,* 579 F.2d 1298, 1326–27 (5th Cir.1978); *N.L.R.B. v. Landis Tool Co.,* 193 F.2d 279, 281–82 (3d Cir.1952).

**3.** The Referee apparently had no difficulty in determining that all the changes improved the workers' terms of employment and enumerated the various changes as follows:

The employees worked under these new and improved terms and conditions until July 20, 1979. On July 21, 1979, the Union finally honored the Employer's request to submit the changes to its membership for a vote. The employees then voted to reject the improved terms and conditions which they had worked under for the past thirty-three days, and to strike. On that day, they initiated their work stoppage. It is this work stoppage which the majority terms a lockout. On October 9, 1979 the Union and Employer agreed on the terms of a new collective bargaining contract and the employees returned to work on October 10, 1979.

FIRST YEAR

EFFECTIVE 12:01 a.m. June 18, 1979

INSURANCE      Raise From
  -Life Insurance      $9,000 to $10,000
  -AD&D      $9,000 to $10,000
  -(Employees with Supplemental Life Insurance will have that raised by a like amount)
  -X–Ray and Lab Maximum      $175/yr. to $200/yr.
  -X–Ray and Lab Schedule      —      Remove Schedule
  -Surgical Maximum      $600 to $650 (Reasonable & Customary)
  -Hospital Maternity      $350 max. to same as other hospitalizations
  -Home Care Benefit      (New Nurse's coverage in the home)
  -Accident & Sickness      $105/wk. to $112/wk.
  -Major Medical
  -$25,000/disability to $100,000 Lifetime per person
  $100 deductible/disability in 3 months to $100 deductible/person per year
  -$250 family deductible per year (Special new feature)
  -$2,000 annual restoration to restore any major medical used previous year

VACATION
  -Add six weeks after 30 years of service (Will be effective this vacation year)

PENSION
  -Raise formula from $8.50 to $9.00
  -Add early retirement reduction factors (Can retire at ages 62, 63, and 64 at only 2% reduction in benefit per year as opposed to previous 5% per year reduction)

WAGES
  -55¢ ACCROSS THE BOARD (EFFECTIVE 6–18–79)

The majority's holding that the Employer's implementation of superior terms and conditions of employment was, constructively, a lockout, simply because that action disturbed the *status quo ante,* undermines the purposes for which our General Assembly enacted the Unemployment Compensation Law and ignores the legislative intent underpinning Section 402(d). The majority's application of the *Vrotney* [4] rule to the facts of this case shows once again how the insensible extension of a *per se* rule, adopted for the convenience of courts, can lead to an inappropriate result when applied in a mechanical and arbitrary fashion. The *Vrotney* rule, with its emphasis on the disturbance of the *status quo ante* to separate strikes from lockouts, may sometimes be a valuable aid to reasoning. It is not a substitute for reasoning.. The world of collective bargaining is not comfortably encased in a clockwork universe.

Our Legislature has stated the purpose of the Unemployment Compensation Law in that statute's "Declaration of Public Policy":

Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of the Commonwealth. Involuntary unemployment and its resulting burden of indigency falls with crushing force upon the unemployed worker, and ultimately upon the Commonwealth and its political subdivisions in the form of poor relief assistance. Security against unemployment and the spread of indigency can best be provided by the systematic setting aside of financial reserves to be used as compensation for loss of wages by employes during periods *when they become unemployed through no fault of their own.* The principle of the accumulation of financial reserves, the sharing of risks, and the payment of compensation with respect to unemployment meets the need of protection against the hazards of unemployment and indigency. The Legislature, therefore, declares that

**4.** *See Vrotney Unemployment Compensation Case,* 400 Pa. 440, 163 A.2d 91 (1960).

in its considered judgment the public good and the general welfare of the citizens of this Commonwealth require the exercise of the police powers of the Commonwealth in the enactment of this act for the compulsory setting aside of unemployment reserves to be used for the benefit of persons *unemployed through no fault of their own.* 43 P.S. § 752 (emphasis supplied). Our Court has repeatedly emphasized that this declaration " 'is not merely a perfunctory preface, but is, rather, the keystone upon which the individual sections of the Act must be interpreted and construed.' " *Penn Hills School District v. Unemployment Compensation Board of Review,* 496 Pa. 620, 625, 437 A.2d 1213, 1215 (1981) (quoting *Department of Labor and Industry, Bureau of Employment Security v. Unemployment Compensation Board of Review,* 418 Pa. 471, 476, 211 A.2d 463, 466 [1965] ). Accordingly:

"Subsequent provisions as to eligibility (section 401, 43 P.S. § 801), or ineligibility (section 402, 43 P.S. § 802), for compensation must all be read and construed as subject to this basic and fundamental declaration. If it is clear that a person's unemployment is the result of his own fault, he is not eligible for compensation under the Act."

*Barclay White Co. v. Unemployment Compensation Board of Review,* 356 Pa. 43, 49, 50 A.2d 336, 340, *cert. denied sub nom. Seifing v. Barclay White Co.,* 332 U.S. 761, 68 S.Ct. 63, 92 L.Ed. 347 (1947) (quoting *Department of Labor and Industry v. Unemployment Compensation Board of Review,* 148 Pa.Superior Ct. 246, 248, 24 A.2d 667, 668 [1942] ).

In keeping with the foregoing policy considerations, our Legislature in Section 402(d) commands that workers whose "unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lockout)" must be denied unemployment compensation benefits. The purpose of this provision is "to prevent the worker from becoming the innocent pawn of forces and movements beyond his control." *Philco Corporation v. Unemployment Compensation Board of Review,* 430 Pa. 101, 110, 242 A.2d 454, 459

(1968) (quoting *Department of Labor and Industry, Bureau of Employment Security v. Unemployment Compensation Board of Review,* 418 Pa. 471, 478, 211 A.2d 463, 467 [1965]). "It is certainly not intended to provide additional strike benefits for union members." *Philco,* 430 Pa. at 110, 242 A.2d at 459.

Before the rule first enunciated in *Vrotney* became entrenched in our law, our courts had defined "strike" and "lockout" in practical terms which reflected the common usage of the words. *See* 1 Pa.C.S. § 1903 (in the construction of statutes "words and phrases shall be construed ... according to their common and approved usage"). For example, in *Armour Leather Company v. Unemployment Compensation Board of Review,* 192 Pa.Superior Ct. 190, 195, 159 A.2d 772, 775 (1960), Superior Court defined a "strike" as:

the act of quitting work done by mutual understanding by a body of workmen as a means of enforcing compliance with demands made on their employer. Webster's New International Dictionary (2nd Edition).

(Footnote omitted.) Similarly, the courts recognized that the lockout is the employer's counterpart of a strike. *Small Tube Products, Inc. v. Unemployment Compensation Board of Review,* 198 Pa.Superior Ct. 308, 315, 181 A.2d 854, 858 (1962). Our courts have further recognized that a lockout "may be present in varying factual situations, and no definition can comprehend all of its manifestations." *Id.* However, the courts have consistently observed that "[t]he gist of a lock-out is an employer's withholding of work from his employes in order to gain a concession from them." *Westinghouse Electric Corporation v. Unemployment Compensation Board of Review (Hughes Unemployment Compensation Case),* 187 Pa.Superior Ct. 252, 259, 144 A.2d 685, 688 (1958) (quoting *Burleson Unemployment Compensation Case,* 173 Pa.Superior Ct. 527, 533, 98 A.2d 762, 766 [1953]). *See Small Tube Products, Inc. v. Unemployment Compensation Board of Review,* 198 Pa.Superior Ct. at 315, 181 A.2d at 858; *Arm-*

*our Leather Company,* 192 Pa.Superior Ct. at 195, 159 A.2d at 775; *Hershey Estates v. Unemployment Compensation Board of Review,* 191 Pa.Superior Ct. 159, 164, 155 A.2d 470, 473 (1959), *affirmed* 400 Pa. 446, 163 A.2d 535 (1960); *Kendall Refining Company v. Unemployment Compensation Board of Review,* 184 Pa.Superior Ct. 95, 100, 132 A.2d 749, 752 (1957); *Weimer v. Unemployment Compensation Board of Review,* 176 Pa.Superior Ct. 348, 352, 107 A.2d 607, 609 (1954).

The rule set forth in *Vrotney* requires the compensation authorities and reviewing court to look at who first disturbed the *status quo.* It was originally developed to further inquiry into "whether the final cause and responsibility or fault for the work stoppage, within the meaning of the policy section of the Law (Section 3, 43 P.S. § 752) lies with the employer or with the employes." *Westinghouse,* 187 Pa.Superior Ct. at 258–59, 144 A.2d at 688. *See Morris v. Unemployment Compensation Board of Review,* 169 Pa.Superior Ct. 564, 568, 83 A.2d 394, 397 (1951). The majority's use of it here to find a "lockout" by an employer who improves his workers' lot is a substitute for inquiry which ignores the plain meaning of the statutory term lockout and serves no other purpose than judicial convenience.

The majority correctly states that, in assessing fault for the work stoppage, the issue is whether the actions of the employer and employees evince a reasonable desire and effort to maintain the employer's operations and the employment status.

> Neither an adamant attitude of "no contract, no work" on the part of the employees, nor an ultimatum laid down by the employer that work will be available only on his (employer's) terms, are serious manifestations of a desire to continue the operation of the enterprise.

Majority at 485 (quoting *Vrotney Unemployment Compensation Case,* 400 Pa. 440, 444, 163 A.2d 91, 93 [1960] ).

In the instant case, Trane's employees worked under the same terms and conditions for two and one-half months

following the expiration of their collective bargaining agreement. The Employer then proposed increases in hourly wages and an improved benefit package. The Union refused to submit the proposals to its membership whereupon the Employer unilaterally implemented them. There is no evidence in the record to suggest that the Employer used coercive tactics in an attempt to get the Union to accept the new terms and conditions. There is likewise no evidence that the Employer issued an ultimatum threatening to withhold work until the employees agreed to a new contract incorporating only its proposals. Moreover, the majority's contention that the implementation of beneficial changes is *inherently* coercive is simply a *non sequitur* on the facts of the case.

This was not the usual situation in which employees are presented with Hobson's choice. Here they enjoyed higher wages and better fringe benefits for thirty-three days before voting to strike. At no time during this period did the Employer threaten to implement employment terms worse than those the employees had under the expired collective bargaining agreement or suggest any action which would otherwise pose a threat to their job security. They were neither intimidated nor enticed by a "carrot on the stick" offered by the Employer in the form of better employment terms. They eventually rejected the new terms and went out on strike, apparently until they obtained a contract containing terms more desirable from their point of view.

The facts of this case, as found by the Referee, show that the Employer made a sincere effort to continue both its operations and the workers' employment status. The employees, on the other hand, initiated a work stoppage to gain further concessions from their Employer. They walked off their jobs voluntarily; they would have lost nothing had they remained. Such unemployment resulted from their will and desire to gain concessions from their Employer. It was not an involuntary result or the fault of the Employer. An employer's implementation of beneficial changes in wages or working conditions after negotiations

fail to produce a contract does not convert a later work stoppage from a strike to a lockout for unemployment compensation purposes where the men and women choose to work under those improved conditions for more than a month. *See Gladieux Food Services, Inc. v. Unemployment Compensation Board of Review*, 479 Pa. 324, 330, 388 A.2d 678, 681 (1978) (in determining the reason for a claimant's unemployment our Court must "confine our inquiry to the immediate cause and avoid the maze that would result from an attempt to ascertain indirect or chronologically remote causes").

The majority states that the *Vrotney* formula was "designed to encourage the continuation of the work relationship under terms previously agreed to by the parties during that difficult period between the expiration of the old agreement and before the new terms of employment [have] been agreed upon." Majority at 486. The majority further explains that, "[i]n addition, the rule is designed to foster a climate, during the period between contracts, conducive to good faith negotiations on an equal basis." *Id.* at 490.

The federal Labor Management Relations Act, 29 U.S. C.A. § 141 *et seq.*, and the Pennsylvania Labor Relations Act, 43 P.S. § 211.1 *et seq.*, were enacted for the purpose of promoting the policy objectives which the majority focuses on in this unemployment compensation case. By engrafting federal and state labor law into our unemployment compensation statute, our courts, in their decisions since *Vrotney*, have fostered the goals of labor law and, at the same time, have increasingly lost sight of those policy objectives which prompted the Legislature to enact the Unemployment Compensation Law.

It may be appropriate, under certain circumstances, for courts to look to appropriately analogous principles of labor law relating to collective bargaining in applying provisions of the Unemployment Compensation Law. This is not such a case and, indeed, the arguably appropriate analogy of "impasse" points the other way. The unemployment compensation proceeding is not the proper place in which to

adjudicate alleged violations of either state or federal labor law or to affirmatively promote policies addressed by the statutes governing labor relations. *See, e.g., D'Amato v. Unemployment Compensation Board of Review,* 196 Pa. Superior Ct. 76, 78, 173 A.2d 680, 682 (1961) ("[t]he principle objective of the Unemployment Compensation Law is to alleviate economic distress in individual cases[;] ... [t]he Law is not designed or intended to implement or to impede collective bargaining between unions and employers"); *Carl Colteryahn Dairy, Inc. v. Unemployment Compensation Board of Review,* 46 Pa. Commonwealth Ct. 319, 326, 407 A.2d 71, 74 (1979) ("a compensation proceeding is not the place to adjudicate an alleged collective bargaining agreement violation or a claimed unfair labor practice"). *See also Burleson v. Unemployment Compensation Board of Review,* 173 Pa.Superior Ct. at 534, 98 A.2d at 766; *Unemployment Compensation Board of Review v. Homsher,* 21 Pa. Commonwealth Ct. 576, 579–80, 347 A.2d 340, 342 (1975).

I believe the result reached by the majority today comes from a misplaced emphasis on labor policy considerations at the expense of the concerns addressed by the express language of the Unemployment Compensation Law. Under that law this result is anomalous at best. Section 402(d) speaks of "stoppage of work" and "lockout," not "disruptions in the status quo." This provision of the statute simply makes striking employees ineligible for unemployment compensation benefits. Had the Employer in this case continued its operations indefinitely under the terms of the expired agreement, a work stoppage by the employees would be characterized as a "strike" even under the *Vrotney* standard, and, therefore, the employees would have been ineligible for unemployment benefits. It is wrong to hold, as the majority does, that employees who initiate a work stoppage when the Employer has properly implemented better terms and conditions of employment than those contained in the old collective bargaining agreement, have been constructively "locked out" of their place of employ-

ment. Today the majority ignores the meaning of the terms "strike" and "lockout" and, in the process, distorts the basic purpose of the Unemployment Compensation Law which is to compensate workers whose loss of employment occurs through no fault of their own, not those who choose to temporarily withhold their labor in order to force their employer into additional economic concessions.

For the foregoing reasons, I respectfully dissent.

FLAHERTY, J., joins in this Dissenting Opinion.