547 A.2d 497

Donna A. Burk, Petitioner *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

Argued April 18, 1988, before Judges MACPHAIL and DOYLE, and Senior Judge NARICK, sitting as a panel of three.

*James A. Diamond,* with him, *Charles W. Johnston, Handler, Gerber, Johnston, Strokoff & Cowden,* for petitioner.

No appearance for respondent.

*Morton Hollander,* with him, *Thomas R. Hendershot, Hendershot, Koester and Worshtil,* for intervenor, Gallitzin Apparel Corporation.

OPINION BY SENIOR JUDGE NARICK, September 12, 1988:

Donna A. Burk (Claimant) appeals from an order of the Unemployment Compensation Board of Review (Board) affirming the denial of benefits under Section 402(d) (labor dispute) of the Unemployment Compensation Law (Law),[1] and not under Section 401(d)(1)[2] relied

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §802(d).

[2] 43 P.S. §801(d)(1). That section provides, in part: "Compensation shall be payable to any employe who is or becomes unem-

upon by the referee in reversing the Office of Employment Security (OES) which granted benefits finding a "lockout" under Section 402(d). We reverse the Board.

This case presents three issues: (1) whether the work stoppage, as a matter of law, was a lockout or a strike; (2) whether strike benefits paid by the Union to Claimant, assuming a finding of a lockout, should be deducted from unemployment compensation payments; and (3) whether the Claimant waived her legal arguments by allegedly failing to raise them before the referee and the Board.

## FACTUAL BACKGROUND

The Claimant was first employed in 1976 as a sewing machine operator by Hollyvent Manufacturing Company and its successor company, Gallitzin Apparel Company (Employer), which has recognized the International Ladies' Garment Workers Union, Local 424 (Union), since 1977 as the certified bargaining agent for its employees at all times relevant herein. Claimant is a member of the Union and its negotiating committee.

In 1982, the Employer and the Union entered into a collective bargaining agreement covering a three-year period from June 1, 1982 to on or about March 31, 1985. The parties being unable to negotiate a new agreement, the contract expired on March 31, 1985. Following the expiration of the agreement, the Employer continued to operate and the employees continued to work under the terms of the expired contract for approximately three months until all employees were laid

---

ployed, and who . . . [i]s able to work and available for suitable work. . . ."

The referee found that Claimant was not ineligible for benefits under Section 402(d), but was ineligible for failure to meet the availability for work requirements of Section 401(d)(1) above.

off on June 26, 1985 for a nine-month period because of a fire at the Employer's plant which caused the plant to be closed for repairs. During this layoff period, the Claimant and other employees received unemployment compensation benefits. At the time of Claimant's layoff on June 26, 1985, she was receiving $4.45 per hour plus piece rate for a 35-hour work week, and fringe benefits, including Blue Cross/Blue Shield, paid holidays, paid vacations, sick pay and pension benefits.

Since June 1985, when the plant was closed for repairs, the Employer and the Union continued to meet in an effort to negotiate a new collective bargaining agreement. On February 25, 1986, after explaining that concessions were necessary due to overseas competition, the Employer made a final and last offer, reducing the hourly rate to $3.50 per hour plus piece rate, mandating a 40-hour work week and eliminating all fringe benefits. This offer was rejected by the Union's negotiating committee. Shortly thereafter, the Employer, without notifying the Union, announced through newspaper ads that it would reopen the plant. The Employer opened the plant and commenced operations on March 12, 1986 under the terms of the Employer's above offer of February 25. The Claimant and other laid-off employees returned to work on March 12, 1986. The Claimant worked from March 12 to March 24, 1986. On March 25, she refused to cross the picket line of approximately 40 pickets which had been established by the Union in front of the plant.[3] Notwithstanding the picketing, the plant continued to operate after March

---

[3] The term "work stoppage" in Section 402(d) means any cessation of work by any employee, regardless of whether continuing work is available from the employer. *Babicka v. Unemployment Compensation Board of Review,* 99 Pa. Commonwealth Ct. 408, 513 A.2d 573 (1986).

25, 1986. The Board found that Claimant decided not to cross the picket line for the following reasons:

1. She would not cross the picket line because she was a member of the union and didn't feel it was right to cross the line.

2. Tried to save the union so [she] would have benefits and more hourly rate than what was offered.

Claimant's last day of employment was March 24, 1986. The next day she was sent a letter by the Employer to report for work or be replaced. She did not reply, which resulted in her being replaced.

## BOARD'S DECISION

In reaching its ultimate determination that the Claimant engaged in a strike under Section 402(d) and was therefore ineligible for benefits, the Board reasoned:

Indeed, this is a labor dispute. Although the employer did change the status quo, the claimant accepted the new terms and conditions of the work place. Then without any further change the claimant decided to withhold her services. Thus, the claimant engaged in [a] strike pursuant to the above referenced Section of the Law [Section 402(d)].

We agree with the Board that the Employer changed the status quo on March 12, 1986 from that which had existed under the terms of the expired agreement under which the employees had worked until late June 1985 when they were laid off. For the reasons below, we disagree that the Claimant accepted the new terms and conditions of the "new status quo" when the plant was reopened on March 12, 1986.

### DISCUSSION

We now consider the three issues, starting first with the third issue. The Employer argues that the Claimant's legal defenses have been waived for failure to raise them before the referee and the Board. It is clear that the OES, referee, and the Board, in considering the critical ultimate issue of whether there was a lockout or a strike, of necessity looked to the relevant law in making their decisions, including the alleged defenses asserted by the Claimant before this Court, and discussed hereinafter. Based on our review of the entire record, we are satisfied that the Claimant did not waive the issues raised in her appeal.

We next discuss the critical issue of whether the Claimant's work stoppage on March 25, 1986 was because of a labor dispute or a lockout under the test enunciated by our Supreme Court in its *Vrotney Unemployment Compensation Case,* 400 Pa. 440, 163 A.2d 91 (1960) and the later cases relevant to the issue before us. Because of the unique facts herein, the issue may be further narrowed as follows: whether the working by the employees represented by the Union for approximately 10 days after the Employer unilaterally implemented a wage reduction and eliminated fringe benefits without protest of the changes during the 10-day period created an acceptance of a "new status quo".

The question of whether a work stoppage is the result of a strike or lockout is a mixed question of law and fact subject to our review. *Philco Corporation v. Unemployment Compensation Board of Review,* 430 Pa. 101, 242 A.2d 454 (1968). In determining eligibility, the claimant bears the burden of proving that the stoppage resulted from a lockout by the employer. *Id.* Our scope of review is limited to a determination of whether there has been a constitutional violation or an error of law, and whether the necessary findings of fact are support-

ed by substantial competent evidence. Section 704 of the Administrative Agency Law, 2 Pa. C. S. §704; *Kirkwood v. Unemployment Compensation Board of Review*, 106 Pa. Commonwealth Ct. 92, 525 A.2d 841 (1987).

Section 402(d) of the Law provides, in pertinent part:

> An employe shall be ineligible for compensation for any week—
>
> . . . .
>
> (d) In which his unemployment is due to a *stoppage of work, which exists because of a labor dispute (other than a lock-out)* at the factory, establishment or other premises at which he is or was last employed. . . .

(Emphasis added.)

The test for determining whether a *work stoppage* is the result of a lockout or a strike was established in the *Hogan Unemployment Compensation Case*, 169 Pa. Superior Ct. 554, 83 A.2d 386 (1951), and adopted by the Supreme Court in *Vrotney:*

> Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a 'lockout' and the disqualification for unemployment compensation benefits in the case of a 'stoppage of work because of a labor dispute' does not apply.

*Id.* at 444-445, 163 A.2d at 93-94.

The general rule, when a work. stoppage takes the form of a strike, is that it is up to the union to show it made the initial peace offering by continuing the status quo. *Philco*.

In this case, the evidence establishes that the Claimant and the Union employees offered and did continue to work under the expired 1982-85 agreement through June 26, 1985, pending contract negotiations. It is clear that the first change in this status as found by the Board resulted from the Employer's unilateral decision to change the wages and ·fringe benefits on March 12, 1986. The Union asserts that in view of the Employer's unilateral action of March 12, 1986, the Employer did, in fact, disturb the status quo and, therefore, its burden under the *Vrotney* test has been satisfied. Further, based on the unique factual matrix of this case, it would have been futile for Claimant and the Union to have made an offer to return to work under the terms of the expired 1982-85 contract. Particularly in view of the Employer's public announcement, without notifying the Union, that it would resume opertion on. March 12, 1986, unilaterally implementing the reductions referred to above, we agree it would have been futile for Claimant to make an offer to return to work under the terms of the expired contract.[4]

---

[4] In *Odgers v. Unemployment Compensation Board of Review*, 514 Pa. 378, 525 A.2d 359 (1987), our Supreme Court concluded that a union's burden to show that it offered to continue the status quo is satisfied where an employer's unilateral actions disturb that status quo. *See also Irvin Unemployment Compensation Case*, 198. Pa. Superior Ct. 308, 313-14, 181 A.2d 854, 857-58 (1962) to the same effect:

> 'The union, in fact, was willing to continue under the existing terms, whereas the employer desired the wage reduction to meet foreign competition. Therefore, the union, acting on behalf of the employes, cannot be held responsible as to the cause of the work stoppage for failing to

The Employer argues, assuming it did change the status quo on March 12, 1986 as found by the Board, the continuance of work by the Claimant and other employees from March 12 to March 25, 1986 (10 days) without protest, evidences the Claimant's and the Union's acceptance of or acquiescence in a "new status quo". Under this theory, the Employer argues the Union's ultimate picketing on March 25, 1986 and the Claimant's refusal to cross the picket line must be viewed as a refusal to maintain this "new status quo" for a reasonable time and, therefore, as a strike and not a lockout. We must reject this argument for the reasons set forth below.

Our Supreme Court rejected a similar acceptance argument in a case where employees worked and the union waited 33 days after the employer unilaterally raised wages and improved fringe benefits before beginning a work stoppage. *Local 730, United Association of Journeymen and Apprentices of the Plumbing and Pipe-Fitting Industry v. Unemployment Compensation Board of Review*, 505 Pa. 480, 480 A.2d 1000 (1984).[5] Although a mutual agreement to modify conditions of employment pending the outcome of negotiations would not be

---

continue work under the pre-existing terms and conditions of employment.' (Citation omitted.)

[5] In *Local 730*, although the parties were unable to reach a new agreement prior to the expiration of the old contract on April 2, the union offered and employer permitted the employees to continue to work under the terms of the expired agreement until June 15, 1979. On the latter date, the employer presented a list of changes, including hourly wage increases and improved benefits, which it intended to implement on June 18, 1979. The union rejected the offer and the employer implemented its proposals as scheduled. The employees continued to work under these changed terms for 33 days, until July 20, 1979, when the membership, having been apprised of the employer's proposals, voted to reject them and stop work.

inconsistent with the objectives of *Vrotney,* in the instant case, as in *Local 730,* the record does not support the existence of such an agreement. The statement by the Court in *Local 730* is applicable to the facts before us:

> The Union's negotiators explicitly rejected the Employer's proposals prior to implementation and declined to present them to the Union membership. The employees' tacit acceptance of paychecks which reflected an hourly wage increase does not in itself support the conclusion that the Union agreed to or that the employees were even aware of the numerous changes in annual insurance, vacation and pension benefits implemented by the Employer. Moreover, the time elapsed between the implementation of those changes and the Union's work stoppage is insufficient to establish an agreement. The Union's representatives clearly required sufficient time in which to ascertain the consensus of the membership regarding the difficult decision whether or not to stop work. . . . On these facts, acceptance of the Employer's 'acquiescence' theory would encourage a union to call a work stoppage upon the implementation of any unilateral change by an employer in order to protect its membership's right to unemployment compensation. Such a rule would defeat Vrotney's crucial objective of encouraging the continuation of the employment situation during good faith negotiations.

*Id.* at 488-89, 480 A.2d at 1004-05 (footnote deleted).

We are satisfied that the time elapsed between the Employer's implementation of the economic reductions and the work stoppage and picketing is insufficient to establish an agreement by the Union to those reduc-

tions, particularly when the Union was not even notified that the Employer intended to re-open the plant.[6] On the facts in this case, we are constrained to conclude that there was a disruption of the status quo as a result of the Employer's action on March 12, 1986, a disruption of the type envisioned by the *Vrotney* rule. Further, the unilateral character of the Employer's action of March 12, 1986 did not reach the point of mutual agreement simply because the Union and the Claimant waited 10 days before the picketing and work stoppage. Accordingly, we hold that the Board erred as a matter of law in holding that Claimant and the Union did not carry their burden of demonstrating that the work stoppage was a lockout.

Having determined that Claimant is entitled to benefits, we turn to the issue of whether the strike benefits received by Claimant, who served on the picket line from time to time, should be deducted from compensation benefits.

Section 404(d) of the Law states, in part:

Notwithstanding any other provisions of this section each eligible employe who is unemployed with respect to any week ending subsequent to July 1, 1980 shall be paid, with respect to such week, compensation in an amount equal to his weekly benefit rate *less* the total of (i) the *remuneration,* if any, paid or payable to him with respect to such week *for services performed* which is in excess of his partial benefit credit.

. . .

43 P.S. §804(d) (emphasis added). The Claimant has received $30.00 a week since the work stoppage of March

---

[6] The claimant learned for the first time on April 2, 1986 when she received her paycheck that the hourly rate was, in fact, $3.50 per hour but did not include any piece rate.

25, 1986. Ms. Yvonne Patz, a representative of the International Ladies' Garment Workers Union, testified that payment was not conditioned upon the striker's performing active picket duty. Section 404(d) states that an eligible employee, "shall be paid compensation . . . *less . . . remuneration . . . for services performed . . . .*" Since the strike benefits herein were not conditioned upon the performing of picket line duty, we find they are not deductible from the compensation benefits. We view the income from strike benefits as analogous to ownership of income-producing property or income derived from other sources because it does not come from the area of "services performed", and, therefore, is not deductible from compensation benefits. *See, e.g., Colello v. Unemployment Compensation Board of Review,* 89 Pa. Commonwealth Ct. 354, 492 A.2d 769 (1985), wherein this Court, albeit in a different context, determined that money received from the partial ownership of a business was not work-related and therefore not subject to the reporting requirements of the Law.

For the foregoing reasons, the order of the Board is reversed.

### ORDER

AND NOW, this 12th day of September, 1988, the order of the Unemployment Compensation Board of Review in the above-captioned case is hereby reversed.